Good morning, your honors. May it please the court, I would like to reserve five minutes. All right. I had three important points to start out with, but I think since there's already been oral argument, I can jump right in if you'd like into the tobacco product standard issue, if I could start with that. So my opposing counsel mentioned that a tobacco product standard, so this is section 387G, focuses on kind of like the constituents, the ingredients. And that is true, but it also gives examples of completely different things. And in fact, the comparative efficacy standard is a tobacco product standard at least three or four times over. So the first thing is a tobacco product standard is defined in 387G to include a substantial restriction and or a ban on sales and distribution. It's not tied to constituents or anything like that. What we have right here now after five years of doing this, 99.92% of these products, non-tobacco flavored products have been kicked off the market. That is not only a restriction. Counselor, did any of those, do you know, did any of those applicants submit evidence in an effort to satisfy the comparative efficacy requirement? So the standard has been applied in 100% of these cases, and FDA doesn't deny that. In 10 cases, that evidence was submitted, the comparative efficacy standard, evidence was submitted. So what happens in the way FDA has set this up, and this kind of goes to your questions regarding review and what they have to do. Once you have that comparative efficacy, then they do the review. The only thing that they are doing in these cases, in 1.2 million cases, is opened up the application, said, is there a comparative efficacy study? And when there wasn't, they checked the box off and we got an MDO. They never did the scientific review. They never looked at all the evidence, and this is the APPH standard. The APPH standard is relative. It's a bouncing test. They never did that in 99.92% of the cases. And so to answer your question, yes, 10 did. So they were moved to scientific review, and then they got their marketing granted order. They, I'm sorry, so those 10 applicants, they were approved? They, I'm not sure if we know, yes, they were, yes, they got marketing granted orders, yes. And is this in the record before us, or is this your knowledge? It is, no, it's online. So you can check that. I don't know if we cited to that. I don't know if we gave a link, but it's the FDA's website. Getting into the 387G argument, the Supreme Court in wages expressly declined to address this rulemaking question. However, it did have reasoning that may bear on the question before us, and it was a unanimous opinion. And in that case, one could read that opinion to say that the comparative efficacy requirement is grounded in the language of the TCA, that it's not just that it's not inconsistent, it's based in the language of the TCA. And the analysis that the Supreme Court undertook to reach that conclusion was based on the language of 387J, not 387G. So in other words, the reasoning the Supreme Court used was based on the adjudication provision of the TCA rather than the rulemaking provision. So recognizing that wages isn't binding authority on this question, doesn't that reasoning constitute a headwind for you to argue that no, the TCA doesn't contemplate that that standard can be applied through 387J rulemaking? It must be applied through 387, I'm sorry, 387J adjudication. It must be applied through 387G rulemaking. Two responses, and I don't think it's a headwind. First, as you talked and Mr. Heyer discussed, this wasn't developed through an adjudication. As I just said, APPH is a balancing task where you look at all of the evidence in a given case. And so for example, like in the NLRB cases, you have a piece of paper, an opinion that says, we looked at all the evidence and we think there's something that we can apply going forward. We don't have that here. All we have is a press release. All you have is a press release for 55,000 products that then announced in that press release, here's the standard that we applied. But even setting aside, and I think this gets more to your question, even setting aside that, Congress actually saw what was about to happen here. And they put up a guardrail. If you look at 387J, there are four ways an MDO can be issued, two are irrelevant to this case, so let's throw them out. There's two more, the long one and the short one. The long one is where you do what they were supposed to do. And that is open up the application and look at all the evidence, balance all of it, it's all relative, and then make a decision. They didn't do that here. Congress said, if you want to do this quickly and efficiently, you have another option. That other option is to rule, to say, to issue an MDO based on just one factor, and that's what the Supreme Court was talking about. The Supreme Court didn't say you can issue an MDO only on a comparative efficacy factor. All it said is that is a relevant factor based on the language of the statute. What Congress said was that you can take a really important issue, because it's so important, and you can issue an MDO, but that factor, that standard had to go through notice and comment rulemaking, because we want those stakeholders to have had their say, the manufacturers, the consumers, whoever else is interested in this. And they didn't do that, they cut it short. They can base an MDO on a factor, one factor, but that factor had to go through notice and comment rulemaking. Congress actually saw this, and it guarded against what FDA is doing right here, and what they've done in 1.2 million cases. And so, unless you have a question, I can finish my thought on 387J. So sales restrictions and bans have nothing to do with flavors, is a standard. Secondly, if you are banning or restricting a flavor, that is also, and that's essentially what they've done, 99.92% of non-tobacco flavors have been restricted or banned. Three, a tobacco product standard is where you are regulating something about a product, whether it's performance or something that FDA deems to be harmful, that's the word, harmful, and they deem flavors to be harmful. So three times over, this is a tobacco product standard under 387J, so Congress said, okay, this is important, banning something that's dangerous, let's do it. But if you want to issue an MDO under 387J, it had to go through notice and comment rulemaking, and it did not. So let me, you asked some questions, Judge Winn, about the actual application and why our application at least should go to scientific review. Remember, they didn't do scientific review here. They didn't look at our application. Our case involves evidence that minors were not using this product. So every year, most of these people in this courtroom have taken the NYTS. You talk about what you, you know, have you smoked a cigarette, etc. It's about 20,000 kids a year, middle school, high school students. The Tobacco Control Act says FDA has to consider two things. It has to consider the PMTA, and it has to consider any other evidence it has about that product in its possession. The NYTS is implemented, carried out by FDA every year. They had data from the NYTS regarding our products. Not a single minor in 2018, 2019, 2020, and 2021, leading up to our MDO, identified there was a blank to say, what are you using? Well, I'm looking at the actual denial order, and it does say that all of your PMTAs lack sufficient evidence demonstrating that your product will provide benefit to adult users that would be adequate to outweigh the risk to youth. So there's some discussion here about what they did consider. They talked about the fact that a randomized control trial study could have been submitted. But then at the end, it does say the review concluded that key evidence demonstrating APPH is absent. Therefore, scientific review did not proceed to assess the other aspects of the application. I'll ask them to address that sentence, but it did seem like they did engage with the evidentiary record that was submitted with the application. The only thing they looked at in the record was whether or not the evidence rose to a comparative efficacy. You look at the TPL in this case, that's the long document that explains the MDO, that's the supporting document. Absolutely no mention of this NYTS data, and that kids never mentioned this product. And they did cite the NYTS and the TPL. They rely on the NYTS results for other things. What you're reading is their reference to the comparative efficacy task, because that's all they did. That is all they looked at in terms of our application. And so they looked at, for example, our cross-sectional survey. The only question they asked about that is that, did that rise to the level of a comparative efficacy? Our position is it doesn't need to. FDA has repeatedly said in the TPL, it says as the risk to kids goes down, so does the magnitude or the degree of benefits that we need to show. So that means they should have asked in this case, is it even appropriate to apply the comparative efficacy test? Because unlike other products, they had evidence, three years worth of evidence, where no kid identified this product as one, they identified others. That's relevant evidence. They told us it was relevant in the 2019 guidance document, in a 2018 public meeting. They said, we want to see the national survey data. They had it. They never considered it. There's not a single mention of it in the TPL or anywhere else in the administrative record. That is a standard APA case. They had to consider and explain why they think it doesn't work. Counsel, let me ask you about your take on Lotus vaping. So in Lotus vaping, this court determined that the comparative efficacy requirement was authorized by the TCA, similar to what the Supreme Court later said in wages, and also determined that it wasn't arbitrary and capricious to apply it. Given that, well, let me ask you, how do you think Lotus vaping applies here? And then I'll follow up. So we don't, and that was going to be my first point, we don't, we're not arguing that the comparative efficacy standard is not relevant. We're not arguing they didn't have authorization or authority to apply it. We are only arguing that, in terms of arbitrary and capricious, that in this case, and that this wasn't the case with Lotus, in this case, we have substantial evidence that minors were not interested in this product. And therefore, it was arbitrary and capricious for FDA not to ask the question, is the comparative efficacy test relevant here? Because the comparative efficacy test assumes, the reason it exists, is because they're assuming this high risk. But we have evidence here that maybe there's not a high risk. Okay, so let me ask this. If the comparative efficacy requirement, and those are the terms in which Lotus vaping and wages refer to it, if it's a requirement, and if the requirement is legitimate, doesn't that mean that if something doesn't meet, if an application doesn't meet the that's the end of the inquiry? In other words, you're castigating the agency for not conducting a further review of these other types of evidence. But if that's a legitimate requirement, isn't that what the meaning of the word requirement would entail? Two things. It's not a requirement. The TCA doesn't say, and every time you have an application, you have to do the comparative efficacy test. We know that because FDA doesn't... No, I follow you. But if the courts have described it as the comparative efficacy requirement, and if this court in Lotus vaping said that requirement was authorized by the statute, and it was not arbitrary and capricious to apply it, if it's a legitimate requirement, then why doesn't the word mean what it ordinarily means? Because this is a balancing test. It's all relative. It's not, you know, we require X, and if you didn't do X, you lose. FDA, under the APPH standard, has to ask in every case, is it appropriate to demand this level of evidence? They don't demand it for tobacco flavored products. They don't even ask that because tobacco flavored products don't present the same risk that, at least generally, non-tobacco flavored products do. So it's not an absolute requirement where they can say, well, if you didn't meet this, you lose. It is all relative. You can have the same exact product, but if one isn't being used by kids and the other is, one might get an MGO and one might get an MDO. You're actually over time, Counselor. Oh, I'm sorry. I know you wanted to save a little bit of time. I'll give you a couple of minutes back. Thank you. I appreciate it. Thank you, Your Honors. May it please the Court. Ben Lewis for the government. This is not a tobacco product standard. The FDA did not need a tobacco product standard to deny this application, and it didn't rely on a tobacco product standard to deny the application here. Petitioner sells e-cigarettes under the label Candy King and fruit candy and dessert flavors like strawberry dweebs, peachy rings, ice worms, strawberry bubble gum. FDA denied that application because it was not appropriate for the protection of the public health. Both this Court and the Supreme Court have explained that FDA is supposed to deny an application when it's not appropriate for the protection of the public health, and all FDA did here throughout its opinion, the only authority it ever relied on was to say that under Section 910 of the Tobacco Control Act, that 21 for the protection of the public health. Here's how its analysis worked, and I think both petitioners here today don't grasp the task that was before the agency to consider the scientific evidence that bore on its applications, and they don't grasp the reality that that scientific evidence is quite strong. FDA took 10 months after these applications were submitted to it, as FDA explains in the course of its TPL, to canvass the scientific literature on the risks of these products, and it concluded that fruit candy and dessert flavored products pose a heightened risk to use because for the straightforward reason that they're more palatable for novice users. And Counsel, can I ask you about that application aspect of it? Was there evidence regarding the appeal to use that was different than the evidence that the FDA had in other cases or in its own independent review? Yeah, so these are licensing applications that are submitted to FDA. They're unlawful until authorized, and so they're submitted with a set of evidence that petitioner provides, and FDA has the general scientific evidence before it as well. FDA, in its reasoning, explained that the general scientific is not really product-specific here, that it's so consistent, so strong. Well, that may be the case. I just want to make sure that I have an understanding of this particular evidentiary record, right, because we're an arbitrary and capricious review, which is a pretty tough standard for these petitions to meet. But at the same time, to the extent that there is contrary evidence, and that's completely shunted aside, that raises a question. Yeah, there's no contrary evidence here. FDA explained in its denial of the marketing order that the reason why petitioner's products posed a risk to youth is that for non-product-specific reasons, fruit, candy, and dessert flavors are more palatable for novice people. So, what is your answer to that? I think their answer to that is, yeah, but not these. We gave you evidence that these specific products, these studies, the kids haven't checked the box that names them. What's your answer to that? So, the only thing that FDA said it didn't consider, I think, in these applications was the marketing plans, because it had already explained why those marketing plans had not been considered. FDA gave an explanation for why it didn't matter that petitioner's products in particular had no sales data to young people, and it didn't matter that its products had not been referenced in, I guess, national surveys. What it said about that is that young people followed the flavors, that its enforcement experience showed that when FDA went after a certain set of flavored products, that young people just went to other flavored products. And the risks here are so obvious, consistent, substantial, overwhelming is what FDA called it, that this product-specific evidence that, I guess, the manufacturer hadn't affirmatively said to FDA that it had sold its products to people who were underage, is not going to change the bottom line conclusion that its products have a heightened risk to youth. And to be clear about what the other side calls the comparative efficacy standard here, all the comparative efficacy standard is the implication from that factual conclusion, that FDA said, because you have a heightened risk over tobacco-flavored products, that you have to show a heightened benefit. And so, in this respect, I really do think this looks nothing like a tobacco product standard. The other side is, of course, correct, that under... If I'm tracking a lot, they rely heavily here in this particular case on, and you've responded to this, there's no evidence that this particular product, and I think it makes some sense that, well, yeah, there's like a million of these things. There's not going to be evidence that the kids are pursuing all million of them, but with a whole bunch go away, they'll just switch. The switching idea makes sense. It seems like their response is, if we were to accept their argument, we would have to, you almost would have to take the comparative efficacy general concept that you're talking about, that you've just been talking about, and we'd have to say, we'd have to couple that with the fact that this particular product is actually causing, having that effect. Instead of just, and if they come forward and say, well, there's no evidence that this particular product, then you couldn't rely on the comparative efficacy. Am I tracking correctly? That seems to be their reasoning here. It doesn't quite make sense to me that, otherwise, you have to prove it. Otherwise, you're really essentially saying that the agency has to prove it for every single one of these million plus products. The agency very much is attempting to do in every one of these applications to derive the comparative efficacy standard from the statute. And it is the reason why that scientific evidence takes up the first half of its denial decisions, is that it considers this aspect of its analysis just to be contingent on the risks. And so to be quite clear about this, in the GLASS authorizations, there are flavored products on the market right now that are mango flavored and blueberry flavors in circumstances where they were able to provide device access, biometric measures that reduce that risk. In that case, the petitioner there did not show a comparative efficacy benefit over tobacco flavored products, and FDA authorized that application anyway, because that what it considers this aspect of analysis is just contingent on the risks of the products. Where there are, is a heightened risk for a flavored product, then the implication is that the petitioner has to show a heightened benefit. Where there is not that risk, the petitioner does not have to show. And they don't, but you still, they still show an overall, under the statute, they have to show a health benefit. Yes. And so is the assumption then that there is a health benefit because they're not concerned about youth diversion? And so there's the general idea that somebody's going to switch from traditional cigarettes to blueberry and whoopie kids? So FDA released a press release on these particular authorizations. I can refer you to the press release on that, which we filed a 28-J letter on, as well as there's a summary document that explains its analysis, and we'd be happy to refer the court to that. But I think there are still certain pending applications on that before the agency, so I can't get ahead of the agency in explaining what's beyond what I've already said, I think, about that application. Yeah, I guess it's just, if you're going to rely on that, which obviously by filing a 28-J letter, if you're going to rely on that as disproving that you're engaging in a certain type of analysis, then it helps me understand what the analysis is that you're saying that the agency did here that disproves that. The bottom line point is that the risk had been reduced, and so they could show their evidence for a benefit outweighs... Logically, you could reduce the risk to zero of diversion to children, and it wouldn't actually show a public health benefit because there's some, there has to be, in addition to that, there has to be that it is going to help adults to have traditional tobacco cessation, I think. I don't know how FDA would respond if truly the risks were zero. Again, I kind of would have to refer you to the summary document, which we'd be happy to file a 28-J letter on. To, I think, make the point here, though, about why this is not a tobacco product standard, a tobacco product standard refers to a very specific thing under a quite different statutory section of the Act, this kind of freestanding rulemaking authority of the agency to govern the construction and labeling and sales. Of course, the other side is quite right. There are many things that the agency could do under that section, including ban flavors, including restrict flavors. The important point, and I think the simplest point to resolve this case, is that what the aid, what the FDA has done here looks nothing like that. FDA has not told manufacturers that it can't have any particular flavor. It hasn't told manufacturers that flavors are banned. What it said is that you can make your product with any flavor you want, but you still have to demonstrate that it's appropriate for the protection of the public health, and the agency is not going to be blind to the scientific evidence that bears on that question. It just so happens here that the scientific evidence, again, is quite strong that flavored products are more attractive to young people, and so to show a benefit, then you have to show a benefit over that risk. I wanted to briefly take the response, I guess, the point about the record that the other side represents, that they claimed that there was a kind of limited screening that was done here, that only looked to one particular part of the application, and then didn't proceed to other aspects of the review for further scientific review. I just want to be clear again that the only thing in the TPL that the FDA said that it didn't consider was the marketing plans and restrictions, which is an issue that is controlled by Lotus Vaping, and Lotus Vaping, I think, makes quite clear that when there is a flaw in an application, that there's no obligation for the agency to further consider the application. What the other aspects that I think the other side is referring to are things like the toxicology has digs into a lot of different materials that bear on a lot of different aspects of the applications, but when the logical conclusion of an application is that there is a heightened risk to your product, and you haven't presented any evidence that could overcome that risk, there's no obligation for the agency to further evaluate and further evaluate that application in order to justify its reasonable thinking. So that's what the FDA, I think, was saying when it didn't consider other aspects of the application. And to be quite clear, I think about this checkbox review. This was after FDA had done its consideration of the scientific evidence that bears on these applications. So in the same way that if this court had a large set of consolidated cases, it might sort those cases into clusters of fact patterns and then start to consider some cross-cutting issues, and then eventually say to its clerks, hey, we want you to take a look at some particular fact patterns, and I want to know exactly how the standard is applied to those circumstances. That's what the agency is doing here. The person who is analyzing the scientific evidence, the person who is signing these TPLs, the person who is issuing these marketing denial orders is the same person. It is the director of the Office of Science here, and all it said is in those checkbox reviews is, we want some more information about these particular kinds of applications. I think I have a view about this particular cluster of fact patterns, and I want to confirm whether these kinds of applications have a comparative efficacy study or a longitudinal analysis, something like that. And then its clerks come back and say, hey, judge, no, these types of applications don't have that type of analysis in it. Proceed from there. So there's nothing, I think, distinct, rule-like. A lot of work is being done in your proceed from there, because I think the proceed from there, even under the hypo you're giving, would be, okay, well, let's deny it then, because we would have made, and that's their argument is, well, then, I think he ends up saying it's all relative, which I think what he means is, none of these should be controlling factors, is what he's saying. None of these are controlling factors. But basically what he's saying, even in a scenario that I think you just explained, you're making the comparative efficacy standard the controlling factor. Now, to be fair to you, you're doing that after you've done all this generalized study. That's your answer. But do you dispute that the comparative efficacy study does sort of, at the tail end of all, become the controlling factor, unless they've, well, do you dispute that? Only in the same way that a judge eventually articulates a standard and then applies it. It is starting from a holistic analysis of whether a product... And their argument is, well, if you're going to do that and apply that standard to a whole bunch of things, and you're an agency, not a court, because a court can't issue rules through rulemaking, but you should make a rule about that. You should make a rule. It never relied on its rulemaking authority. It wasn't trying to do. All it was doing, I think, was here was deriving, in every case, the appropriate standard and then applying it as a judge does. And just to be clear about this, I think their argument ultimately does boil down to this is a tobacco product standard because FDA has said something about tobacco products through something that looks like a standard. I just want to be clear about how untenable that conclusion would be for the agency. The agency is in the business here of articulating the considerations that bear on new tobacco products and then developing and applying standards under the statutory analysis for whether a product is appropriate for the protection of the public health. There's no way that the agency could go through notice and comment rulemaking before it refines or articulates every type of consideration and then applies. Thank you, counsel. Just quickly, on the last point, they have applied this as a non-flexible across-the-board binding standard. They never get the scientific review. They never ask the question, should we be flexible here? It is just a checkbox on a form, and then we get the MDO. To go to his point regarding that they kind of did respond to the NYTS, they never mentioned the NYTS in that data. What his point was is that there's data showing that miners will switch device types, so from disposables to carts or cartridges or vice versa. That is not the same. That is not data that speaks to whether or not eventually miners would start using more products. We have years of data, three years, 2019 to 2021, showing that miners are not switching. That's relevant evidence. They told us that was relevant evidence, so they have to consider it under the APA, and they have to explain their decision, and they did not. Going back to another point about benefits, yes, we have to show benefits, and we did. Remember, FDA has said repeatedly, as the risk to miners goes down, and we have a lower risk here, at least there's evidence of it, so does the hurdle we have to get over. That high hurdle of comparative efficacy may no longer exist. We had a cross-sectional survey, 10,000 drip more consumers, people using these products. Forty-two percent said, yes, we are using these. Either we've used them to quit, or we are using them to quit. That is a benefit, in addition to the literature reviews and everything else we submitted. That was never considered. The only thing they did when they looked at the applications is, does that evidence rise to a comparative efficacy test? If it didn't, we got the checkmark, not flexible, bright-line rule, that is a standard. Thank you. Thank you very much, counsel, for your helpful argument this morning. The matter is submitted.
judges: NGUYEN, VANDYKE, Huie